402 P.2d 384

STATE of Idaho, Plaintiff-Respondent,

v.

Donald RAMSBOTTOM, Defendant-

Appellant.

No. 9497.

Supreme Court of Idaho.

May 13, 1965.

Rehearing Denied June 14, 1965.

Allan G. Shepard, Atty. Gen., M. Allyn
Dingel, Jr., Asst. Atty. Gen., and Dwaine
L. Welch, Pros. Atty., of Payette County,
Payette, for respondent.

Donart & Weston, Weiser, for appellant.

SMITH, Justice.

Appellant has appealed from a judgment of conviction of the offense of issuing a bank check knowing that at the time of issuance he did not have sufficient funds or credit in the drawee bank to pay the check upon presentation.

Appellant assigns as error the failure of the trial court to grant his motion to dismiss at the conclusion of the State's case, and later to grant his motion for directed verdict, for the reason that the check was postdated and that the payee knew, or should have known, of this fact, and that the evidence conclusively showed an agreement between the payee and appellant not to negotiate the check until a subsequent date. Appellant also assigns as error the trial court's failure to grant a mistrial after certain prejudicial testimony was first admitted at the trial, and later stricken, even though the court attempted to correct the error by instruction to the jury.

I.C. § 18–3106, under which appellant was charged and prosecuted reads in part:

"(a) Any person who for himself or as the agent or representative of another or as an officer of a corporation, wilfully, with intent to defraud shall make or draw or utter or deliver, or cause to be made, drawn, uttered or delivered, any check, draft or order for the payment of money upon any bank or depositary, or person, or firm, or corporation, knowing at the time of such making, drawing, uttering or delivery that the maker or drawer has no funds * * * in or credit with such bank or depositary, or person, or firm, or corporation, for the payment in full of such check, draft or order * * * upon its presentation, although no express representation is made with reference thereto, shall upon conviction be punished by imprisonment in the state prison for a term not to exceed three

years or by a fine not to exceed $5,000.-00 or by both such fine and imprisonment.

"* * *

"(d) As against the maker or drawer thereof, the making, drawing, uttering or delivering of such check, draft or order as aforesaid shall be prima facie evidence of intent to defraud and of knowledge of no funds or insufficient funds, as the case may be, in or credit with such bank, or depositary, or person, or firm, or corporation, for the payment in full of such check, draft or order * * * upon its presentation. The word 'credit' as used herein shall be construed to mean an arrangement or understanding with the bank or depositary, or person, or firm, or corporation upon whom such check, draft or order is drawn for the payment of such check, draft or order."

The offense charged arose out of a sale by Robert Troyer, the prosecuting witness, of one barrel of roofing oil to appellant for the sum of $23.65. The sale took place on August 8, 1963, in Payette, Idaho, about 3:00 P.M., when appellant went to Troyer's office to make the purchase. Mr. Troyer, a distributor for an oil company, testified that appellant had been in partnership with one Leon Smart, for some six months prior to the time of the sale, and that Smart had purchased a barrel of oil but failed to pay for it. Troyer asked appellant how he planned to carry his account, to which appellant replied, "I'll pay for it." The two men then proceeded to the location where the roofing oil was kept and Troyer loaded the oil onto appellant's truck. Appellant then wrote a check, in Troyer's presence, to Troyer as payee, drawn upon a drawee bank in Ontario, Oregon, for the amount of the purchase price of the oil, to which check appellant signed his name as the drawer. Appellant dated the check August 9, 1963, a day later than the sale and purchase transaction.

Troyer testified on direct examination:

"Q. Now, state whether or not, when this check was given to you, anything was said about this check or the date thereon?

"A. There wasn't anything said about the date. * * *

"Q. All right. Now, did you at the time you accepted this check—state as to whether or not you noticed the date on the check?

"A. I did not notice it.

"Q. Now, you stated, Mr. Troyer, that some conversation was had about the fact that he might stop and pick up the check?

"A. He said that—that he was to have some money coming in from a job. Well, first he said, 'When do you go to the bank?', and I said, 'Well, we

probably will deposit tomorrow about 2:00 or 2:30.' And he said, 'Is it all right if I stop and pick up the check. I have some money coming in from a job.' I say, 'Sure'. And I said, 'Now, if you don't get there, is it all right to run the check through?' He said, 'Yes, I got money in the bank to cover it.'

"Q. State as to whether or not he said he had a checking account in this bank?

"A. He did.

"Q. And I understand you to say he said that the check was good?

"A. He said the check was good, and he said if he didn't get there, just go ahead and run it through.

"Q. Now, in this conversation, did he actually say that he was going to pick up the check?

"A. No, he just said that he might stop and pick it up.

"Q. All right. In this conversation, also, state as to whether or not you made any promises that you would hold the check or anything like that; that you would do anything out of the ordinary which you usually did?

"A. No, I made no promises at all. * * *"

The next day, August 9, 1963, Mr. Troyer deposited the check with other funds to the credit of his bank account in a Payette bank. Troyer did not see the check again until it was returned to his bank and he stated he "had to go down and pick it up".

On cross-examination Troyer testified that he examined the check to see if it was drawn for the proper amount, and was properly signed; and that he filled in his own name on the check as payee; that he did not particularly notice the bank on which the check was drawn, but assumed that it was a certain bank in Ontario, Oregon, because of the color of the check. He testified once again that he did not notice the date on the check, but that he had the opportunity to observe it.

An officer of the Ontario bank, upon which appellant drew his check, testified in effect that during the month of August 1963, appellant had no funds on deposit or credit with such bank.

Appellant's father, called as a witness for the defendant, testified that during the morning following his son's arrest on the bad check charge, he talked with Troyer about the complaint Troyer had filed against appellant. The father, relating the substance of the conversation, stated: "It was about this check. He said it was another fellow owed him a bill, Leon Smart, and he was supposed to hold the check, but if I would pay both checks, both bills, he would withdraw the charges." The elder Ramsbottom also testified in substance that Troy-

6

er stated that he was supposed to hold the check.

Troyer, then called by the defense, admitted on direct examination, that during his conversation with appellant's father he, Troyer, offered to drop the charges against appellant if both the check and Leon Smart's bill were paid. On cross-examination, however, he explained such testimony by saying that appellant's father had said, "I understand that if I come in and pay off these bills, that you will drop the charges," to which Troyer replied, "I will see what I can do." Troyer also quoted appellant's father as saying, "If you want your money, you had better see what you can do about it, about getting these charges dropped."

Appellant's sister, called by the defense, testified to a conversation had with Troyer the night he filed the complaint against appellant. She testified:

"Q. What was the conversation between yourself and Mr. Troyer?

"A. I asked him if he would drop the charges if we would pick up the check and he wouldn't say yes or no; and then we talked and pretty soon he said, him and this Smart, * * * they used to work together didn't they, and I said, 'Yes, a long time ago, and Leon [Smart] always took him.', and he said, 'Well, Leon owes me a bill'. He said, 'If you will pay both the bills and pick up the check, I'll drop the charges'. And—

"Q. Any conversations between yourself and Mr. Troyer as to a possible agreement between the defendant and this Complaining Witness to hold that chcek?

"A. Yes, he said that he shouldn't gave him that check. And I said, 'Well, you knew when you took it, you were supposed to hold it'. He said, 'Yes, but he still shouldn't have gave it to him'."

Appellant then rested his case.

On rebuttal, respondent recalled the complaining witness, Robert Troyer. He testified that he was unaware of any agreement to hold the check, and that the first he had heard of any such alleged agreement was in the courtroom. On cross-examination, appellant's counsel asked the following questions:

"Q. But he was given to understand that say he would come at 10:00 o'clock on the morning of the 9th [of August], the check would have been there; he could have redeemed it right then and there?

"A. Well, I imagine that would have been his understanding.

"Q. And from what you had told him? A. Yes."

On redirect examination Troyer testified

that he did not agree to do anything out of the ordinary which would not be done in the regular course of business and on re-cross he testified:

"Q. If I understand Mr. Welch's question, nothing had been said to him that you were going to deviate from your normal business operation on this check?

"A. Well, nothing but if some emergency would, had come up, I wouldn't have deposited, wouldn't have gone ahead and deposited.

"Q. You told him that?

"A. No, I didn't tell him that."

Mrs. Troyer, the complaining witness's wife, then called by respondent, stated that she heard such conversation between her husband and appellant's father.

Appellant interposed a motion for a mistrial on the basis of certain allegedly prejudicial testimony elicited from Mr. and Mrs. Troyer, which motion the trial court denied. The court also denied appellant's motion for a directed verdict made after both parties had rested.

The jury returned its verdict finding appellant guilty of the offense charged, of issuing a no account check. Appellant perfected an appeal from the ensuing judgment of conviction and sentence of penal servitude.

A drawer who knowingly and intentionally issues a postdated check in the regular course of business without sufficient funds in or credit with the drawee bank for the payment thereof in full upon presentation, and who neither calls to the attention of the payee that it is postdated, nor makes any arrangements with the payee to hold the check, commits the crime of drawing a check without funds, under the provisions of I.C. § 18–3106, as amended. State v. Eikelberger, 72 Idaho 245, 239 P.2d 1069, 29 A.L.R.2d 1176 (1951).

Evidence that the drawer made a check, knowing at the time that he did not have sufficient funds in or credit with the drawee bank to cover payment upon presentation, will support the implied finding of the jury of the drawer's intent to defraud. I.C. § 18–3106, as amended; State v. Eikelberger, supra; People v. Weaver, 96 Cal. App. 1, 274 P. 361 (1929).

There is sufficient though conflicting evidence in the record if believed by the jury, to prove that the payee did not accept appellant's check as a postdated check, or that the payee extended credit to appellant by promising to hold the check, or that appellant requested the payee to hold the check. The evidence is also sufficient if believed by the jury to prove that appellant did not direct the payee's attention to the fact that appellant had postdated the check, or that the payee knew that the check

**8**

was postdated when he accepted it. Those issues resolved against appellant being factual, were exclusively within the province of the jury to resolve, with the right to believe or disbelieve all of the testimony of any witness or witnesses, and especially the testimony of an interested witness. State v. Eikelberger, 72 Idaho 245, 239 P. 2d 1069, 29 A.L.R.2d 1176 (1951); State v. Eikelberger, 71 Idaho 282, 230 P.2d 696 (1951); State v. Sedam, 62 Idaho 26, 107 P.2d 1065 (1940); State v. Cacavas, 55 Idaho 538, 44 P.2d 1110 (1935); State v. Brown, 53 Idaho 576, 26 P.2d 131 (1933); State v. Orr, 53 Idaho 452, 24 P.2d 679 (1933); First Nat. Bank of Shenandoah, Iowa v. Hall, 31 Idaho 167, 169 P. 936 (1917).

 Where, as here, the jury's verdict of conviction of the crime charged is supported by substantial, competent though conflicting evidence, it will not be disturbed by the Court on appeal. State v. Coburn, 82 Idaho 437, 354 P.2d 751 (1960); State v. McKenna, 78 Idaho 647, 309 P.2d 206 (1957); State v. Fedder, 76 Idaho 535, 285 P.2d 802 (1955); State v. Johnson, 74 Idaho 269, 261 P.2d 638 (1953); State v. Hewitt, 73 Idaho 452, 254 P.2d 677 (1953); State v. Eikelberger, supra.

Appellant grounds his assignment of error of the trial court's failure to grant his motion for a mistrial, upon the premise that certain testimony, which erroneously crept into the record, was highly prejudicial to the defense. That testimony, which referred to appellant's prior difficulties, was elicited by the prosecuting attorney from both Mr. and Mrs. Troyer when they related the conversation of appellant's father with Mr. Troyer the morning after appellant's arrest upon the complaint of his having issued a bad check. Mr. Troyer testified:

"Q. Now, what was his [appellant's father] statement to you * * * at the time he came to see you?

\* \* \* \* \* \*

"A. He said, 'This isn't the first time Don has been in trouble. This time they will probably throw the book at him—'. He said, 'If it wasn't sure—

\* \* \* \* \* \*

"MR. WELCH: If your Honor, please, this is a part of the case which has been brought out by the defense in this action and by their witnesses and their testimony, and I believe that the State has a right to go back into this and show the statements that were made and the full conversations that took place at this time.

"MR. WESTON: Not if this conversation contains irrelevant and prejudicial material.

"THE COURT: Objection overruled. You may proceed.

"A. He said, 'This wasn't the first time that Don had been in trouble and this time they would probably throw the book at him'. And he said, 'If it wasn't for his sister and his mother, he wouldn't even be in here trying to buy it off'."

The second time mention was made of other difficulties was during the direct examination of Roberta Troyer, called as a rebuttal witness for the prosecution, as follows:

"Q. Did you hear any other conversation?

\* \* \* \* \* \*
"A. Yes. He said that this wasn't the first time that Don had been in trouble and that if it wasn't for his sister and mother—

"MR. WESTON: I again object and move that that be stricken as being prejudicial and irrelevant to this case. It's going beyond anything that was brought out in the case by either the State of [or] the Defendant.

"THE COURT: At this time, the Court is going to strike any reference to any other trouble both as stated by this witness and the previous witness on the ground that it's immaterial to this case. You may proceed."

After one other objection when it appeared that the witness intended again to delve into the asserted prejudicial segment of the conversation, the matter was dropped. At the conclusion of Mrs. Troyer's testimony the defense made a motion for mistrial, which the trial court denied. The court gave a special jury instruction on the objectionable testimony, to-wit:

"You are instructed and directed to entirely disregard any testimony of any difficulties or troubles other than the one charged in the information in this case."

We are constrained to the view that the admission in evidence of the referred to testimony of the two witnesses, was prejudicial to the defense and in the absence of corrective measures by the trial court, would have constituted error. However the court granted appellant's motion to strike such testimony, and struck from the record any reference to any other troubles of appellant, as referred to by both witnesses, and additionally the court properly instructed the jury to disregard entirely, any testimony concerning any of appellant's difficulties other than as charged in the information. Under such circumstances, the trial court

did not abuse its discretion in denying appellant's motion for a mistrial.

■ A motion for mistrial is directed to the trial court's sound discretion, and the ruling thereon will not be disturbed unless there be shown such an abuse of discretion that a party's rights are prejudiced. Barry v. Arrow Transportation Company, 83 Idaho 41, 358 P.2d 1041 (1960); Henderson v. Twin Falls County, 59 Idaho 97, 80 P.2d 801 (1938), appeal dismissed, 305 U.S. 568, 59 S.Ct. 149, 83 L.Ed. 358 (1938).

■ Error in the admission of evidence may be cured by a proper instruction to the jury. Barry v. Arrow Transportation Company, supra; Crossler v. Safeway Stores, Inc., 51 Idaho 413, 6 P.2d 151, 80 A.L.R. 463 (1931); Smith v. Hines, 33 Idaho 582, 196 P. 1032 (1921). It must be presumed that the jury obeyed the trial court's instruction to disregard entirely the objectionable testimony, State v. Jester, 46 Idaho 561, 270 P. 417 (1928); and that the instruction cured the error of the admission of such immaterial evidence, State v. Autheman, 47 Idaho 328, 274 P. 805, 62 A.L.R. 195 (1929). See also State v. Polson, 81 Idaho 147, 339 P.2d 510 (1959).

The judgment is affirmed.

McQUADE, C. J., and McFADDEN, TAYLOR and KNUDSON, JJ., concur.