A89A1545. GALBREATH v. THE STATE.
(387 SE2d 915)

BIRDSONG, Judge.

Appellant Albert Monroe Galbreath appeals his sentence and conviction of one count of making and delivering a $4,000 bad check.

Appellant negotiated the purchase of a 1988 Porsche automobile. On November 18, 1987, appellant's loan application was approved for bank financing, but only for the invoice value of the car. Appellant was notified that he would be required to make a sizeable downpayment in order to finalize the purchase transaction.

At trial the business manager of the automobile dealership testified as follows: Appellant was notified at about 1:00 or 2:00 p.m. on November 18 that his loan had been approved, but that he needed to bring a cashier's check in the amount of $6,000 to the dealership as a downpayment. Appellant did not arrive at the dealership that evening until after normal banking hours between approximately 5:00 or 5:30 p.m. After signing all necessary transaction documents, including the installment contract, appellant was asked for the cashier's check, but he did not have it. Appellant expressly informed the business manager that he had $4,000 of the money in a bank account, and upon being paid a week from the coming Friday he would have the remainder. Appellant and the business manager agreed that appellant could tender two checks in the amounts of $4,000 and $2,000, respectively. The business manager, after consultation with the dealership's sales manager, further agreed that the bank would hold the check for $2,000 until November 27. The dealership as a general policy never

accepts postdated checks; customers are asked to date checks to be held as of the date of tender. The $2,000 check was postdated "11/27/87" by appellant, and the $4,000 check was postdated "11/19/87." The business manager previously had asked appellant to date both checks as of the date of tender, November 18. She was unaware that appellant had postdated the checks, and stated "[o]bviously that slipped by me." Appellant represented to her that the $4,000 check was good; at no time did she represent to appellant in any way either that he could postdate the $4,000 check or that she would hold it for him. Appellant accepted delivery of the automobile that evening. The business manager would not have accepted the $4,000 check and given appellant possession of the car if he had told her the check for $4,000 was not good when tendered. On November 19, the next day, appellant's $4,000 check was taken to the dealership's bank for deposit; the check twice was presented for payment and each time returned for nonsufficient funds. Subsequently, the $2,000 check was returned for nonsufficient funds after it was presented on November 27. The business manager attempted to contact appellant at home, but his phone was disconnected; when the business number given by appellant was called, the business manager was informed appellant did not work there. On his credit application, appellant listed himself as a "supervisor" with Atlanta Boring & Tunneling; he never asked the business manager to put on the application that he was self-employed. Attempts to reach appellant through his parents' home and his mother's place of employment were to no avail. A certified letter of notification that the two checks had been dishonored was returned as "unclaimed." A letter of notification sent to the employment address on appellant's credit application was returned with the notation, "[e]mployee does not work here anymore." Appellant has never made either check good. The car was repossessed several months later; it had some body damage that was repaired, and approximately 15,000 miles on the odometer. The car had 40 miles on the odometer when delivered to appellant. Appellant never told the business manager that he would honor the checks if the car title was accurately corrected.

Appellant testified that he had told the business manager that he did not have the $6,000, but that he would be getting paid. He requested and she agreed to hold his two checks. The $4,000 check was to be held until Friday, November 20, and the $2,000 check was to be held until Friday, November 27. He could have paid the checks from other bank accounts, but a dispute arose over the wording of the title when the bank refused to add the word "Jr." to the name thereon. He never was notified that a certified letter was waiting for him at the post office. However, appellant made a judicial admission that when he tendered the two checks, "[he] knew that [he] didn't have the

money then." Appellant's testimony, that he told the business manager that he was postdating both checks and that she agreed to hold them for him, was corroborated by his ex-fiancee. *Held*:

Appellant's sole enumeration of error is that the trial court erred in denying his motion for directed verdict of acquittal. Primarily, appellant asserts that under the precedent of *Bivens v. State*, 153 Ga. App. 631 (266 SE2d 304), he cannot be found guilty of violating OCGA § 16-9-20, because the $4,000 check was postdated, and thus the State cannot establish as a matter of law that appellant had the present fraudulent intent necessary at the time the check was tendered.

In *Neidlinger v. State*, 17 Ga. App. 811 (2) (88 SE 687), this court, in construing the bad check act of 1914, concluded that "[t]he statute was not intended to cover a [postdated] check accepted by the payee *with distinct knowledge* that the paper constitutes nothing more than a promise that, on the future date specified as the day of payment, the drawer will have in the bank the funds necessary to meet the check." (Emphasis supplied.) The court further observed, that "[i]n drawing a [postdated] check there is an implication either that there is no present consideration (as where a trade is not to be finally consummated until the day named in the check), or an implication that payment is postponed because the drawer has not, at the time the check is drawn, sufficient funds to meet it. In either event the check is merely a promise to pay in the future. One who *knowingly* takes a [postdated] check, under the circumstances . . . in this case, and exchanges an article of value therefor, makes the exchange not upon his faith that the drawer has at the time sufficient funds to meet the check, but upon his willingness to risk the ability of the drawer to make a deposit and to have in bank, on or after the date mentioned in the check, sufficient funds with which to comply with his obligation." (Emphasis supplied.) Id. at 815.

The case before us clearly is distinguishable from the facts in *Neidlinger*. First, appellant took delivery of the automobile on the same day as he tendered the postdated check, thus there existed present consideration. Secondly, the implication inherent in a postdated check, that the drawer currently has insufficient funds to cover the amount in the draft, was directly contradicted by appellant's express assertions to the business manager that he had $4,000 currently in the bank and that the $4,000 was good. Further, continuing to construe the evidence to support the verdict as we are required to do on appeal, we find that unlike the *Neidlinger* circumstances, the dealership and its agent did not *knowingly* accept a postdated $4,000 check from appellant.

In *Strickland v. State*, 27 Ga. App. 772 (110 SE 39), in construing the bad check act of 1919, this court followed the precedent of

*Neidlinger.* The facts in *Strickland,* show that the payee was fully apprised that the tendered check was postdated. Id. The court opined that " '[t]he statute was not intended to cover a [postdated] check *accepted* by the payee *with distinct knowledge* that the paper constitutes nothing more than a promise that, on the future date specified as the day of payment, the drawer will have in the bank the funds necessary to meet the check.' " (Emphasis supplied.) Id. at 773. Moreover, this court interpreted the requirements of the 1919 act as being consistent with its holding in *Neidlinger,* "that one cannot be criminally liable for giving a worthless [postdated] check, for [the act's] provisions as to checks or other papers therein mentioned are confined to such papers as are accepted *with knowledge* 'at the time of such making, drawing, uttering or delivery, that the maker or drawer has not sufficient funds in or credit with such bank . . . for the payment of such check.' " (Emphasis supplied.) Id. at 773. In *White v. State,* 27 Ga. App. 774 (110 SE 40), this court followed the precedent of *Strickland* in a situation where the postdated check was drawn at the payee's request. The court in *White* expressly noted that "[a]t the time [appellant] drew the check, he stated to the payee that he had no funds in the bank at the time, but hoped to have such funds by the maturity of the check." Id. The facts of this case clearly are distinguishable from both *Strickland* and *White,* as the payee's agent testified she did not knowingly accept a postdated check, that appellant expressly told her the check was good, and that appellant told her that he then had $4,000 in the bank.

In *Highsmith v. State,* 38 Ga. App. 192 (143 SE 445), the facts show that the payee "agreed with the defendant to hold the check for two weeks before presenting it to the bank" and that the defendant never told the payee that he had no money in the bank with which to pay the check. Id. at 193. This court held that the gravamen of a bad check offense under the act of 1919 "is the 'intent to defraud' [Cit.]; and since the [payee] testified that he accepted the check under an agreement that he would not collect it for two weeks, the transaction was nothing more nor less than an extension of credit . . . and a promise by the defendant to pay . . . at a future date." Id. at 194. Accordingly, the court in *Highsmith* found that *Neidlinger* and *Strickland* precedents controlling. Id. Likewise, the facts of this case substantially differ from the facts in *Highsmith.* The business manager in this case testified that she only agreed to hold the $2,000 check, and that she asked appellant to date the $4,000 check as of the day of tender. She further testified that she did not represent to appellant in any manner that it would be acceptable for him to postdate the $4,000 check or that she would hold it for him. Subsequently, the business manager gave appellant two receipts; a receipt for the $4,000 check dated November 18, the day of tender, and a receipt for the

$2,000 check dated November 27, the date on which that check was to be deposited in the dealership's bank account. The $4,000 check was deposited on November 19, because the dealership did not make "night deposits." The manner in which these receipts were dated tends to corroborate the business manager's testimony that she did not *knowingly* accept the $4,000 check as postdated. Thus in view of the difference in facts, the precedent of *Highsmith* is not controlling in this case.

In *Bivens v. State*, supra, this court followed the precedent in *Neidlinger* and *Highsmith* in a case involving a bad check prosecution under Code Ann. § 26-1704 (a) (now basically codified as OCGA § 16-9-20 (a)). The facts in *Bivens* establish that appellant gave an attorney five checks. The checks were to be negotiated by the attorney, one at the end of the month and the remaining four individually at the end of the succeeding four months, but only for services rendered. The second check to be negotiated was returned for insufficient funds. Citing *Highsmith* and *Neidlinger*, we concluded that "[a]t best, there is *implied* in the issuance of the checks a promise to cover the drafts when they were presented in the future. Such a promise of *future performance* cannot serve as a basis for a bad check charge." (Emphasis supplied.) Id. at 632. We further stated that "if a check is postdated, or if the giver of the check states that he has not enough money in the bank to cover it though he expects to have it by the time the check is presented for payment, there can be no *implied* representation that there is now enough on deposit to cover the check. In short the [S]tate did not prove by implication *or otherwise* that [appellant] issued checks . . . with a *present fraudulent intent* of deceiving [payee] at the time of issuance by not intending to have funds in the bank sufficient to meet the checks upon presentment." Id. at 632.

Clearly *Bivens* is not controlling here. Unlike *Bivens*, the facts in this case include the testimony of the business manager that she did not knowingly accept the $4,000 check as a postdated check, that appellant expressly stated he currently had $4,000 in his account and that the check was good, and that she did not agree to hold the check for future deposit. In this case, evidence was presented to the jury of an express representation that there now was enough money on deposit to cover the $4,000 check. Thus at the time of check issuance, the State did not have to rely upon the proof of present fraudulent intent to deceive from the face of the instrument itself. Moreover, in view of its reliance on the precedent of *Highsmith* and *Neidlinger*, it is clear that *Bivens* does not stand for the principle that mere *unknowing* acceptance of a postdated check will per se preclude the State from proving *by other means* that the check was tendered with the requisite present fraudulent intent. Compare *Bivens*, supra, with

*Strickland,* supra, and *Neidlinger,* supra.

"It has been held that a worthless check statute is not violated by the making or delivering of a postdated check if the payee accepts it *knowing* that it is postdated *and* there is no other misrepresentation that the check is good or that the maker has sufficient money in his account. But *where one knowingly and intentionally issues a postdated check* in the regular course of business *without having sufficient funds* in or credit with the bank for the payment on presentation thereof, *and without calling to the attention of the payee the fact that the check is postdated or arranging with the payee to hold the check,* the maker of the check is guilty of the crime denounced by the worthless check statute." (Emphasis supplied.) 32 AmJur2d 296, False Pretenses, § 86; compare *State v. Ramsbottom,* 402 P2d 384 (Idaho) and *People v. Lane,* 300 P2d 321 (DCA Calif.). We find these principles can be applied to bad check offenses prosecuted under the authority of OCGA § 16-9-20 (a). Moreover, we decline to construe *Neidlinger* and its progeny as requiring a different result.

Notwithstanding any contrary implication contained in the special concurrence, we do find that the State must prove a present fraudulent intent on the part of any maker of a postdated check in order to sustain a conviction for a bad check offense under Georgia law. Clearly, such a present fraudulent intent may be inferred by the factfinder when the maker knowingly and intentionally issues a postdated check in the regular course of business without having sufficient funds to cover the check when presented for payment, and when the maker does not call attention to the payee of the fact that the check is postdated or arrange for the payee to hold the check until some future time. Adoption of this rule does no more than allow the true nature of a criminal transaction to be proven in these appropriate circumstances, in spite of the fact that the check used to facilitate the commission of the offense bears a date in futuro. Considering the commonly and widely known serious rise in the number of bad check offenses within this state, the legal interpretation expressed in this opinion is overdue. Whether future legislation should be enacted to more strictly circumscribe the fraudulent passing of bad checks, by the convenient vehicle of "postdating," to unsuspecting innocent recipients in this state is a matter warranting careful consideration.

"[A] motion for directed verdict in a criminal trial should only be granted where there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law." *Taylor v. State,* 252 Ga. 125 (1) (312 SE2d 311). Considering the posture of all the evidence in this case, *Bethay v. State,* 235 Ga. 371, 375 (219 SE2d 743), and the legal principles above discussed, we are satisfied that the trial court did not err in denying appellant's motion for directed verdict of acquittal. The conflicting evidence in this case warranted

jury resolution.

*Judgment affirmed. Deen, P. J., concurs. Benham, J., concurs specially.*

BENHAM, Judge, concurring specially.

Although I agree with the majority that appellant's conviction must be affirmed, I cannot agree with the legal analysis employed to reach that result or with the need to import into Georgia law the broad statements of law quoted by the majority from AmJur2d.

"Statutes imposing criminal liability are to be construed strictly; and although there is not, in the Act of 1914 [Acts 1914, p. 86; Park's Annotated Code, Vol. 6, § 718 (d)] an express statement that its provisions as to the drawing and uttering of checks and other papers therein mentioned are confined to and refer only to such papers as are drawn or uttered with intent to defraud, it is plain that such fraudulent intent must exist and be operative before the drawing or uttering of the papers named in the statute would be criminal. The concept of a fraudulent intent must be read into the statute; otherwise the law would contravene the general provision that, to constitute crime, intent must concur with the act. [Cit.] . . . [T]he act would be in effect nothing more than a means of enforcing promises and other civil obligations, and of collecting debts by the process of the criminal law; which is utterly abhorrent to public policy as announced by the courts and as embodied in the constitution of our State. [Cit.]" *Neidlinger v. State*, 17 Ga. App. 811, 814 (88 SE 687) (1916).

The requirement of an intent to defraud before criminal sanctions attach has its basis in the constitutional provision prohibiting imprisonment for debts. Ga. Const. 1976, Art. I, Sec. I, Par. XX (see new Ga. Const. 1983, Art. I, Sec. I, Par. XXIII; *Cobb v. State*, 246 Ga. 567 (272 SE2d 299) (1980).

The majority cites cases from foreign jurisdictions authorizing conviction for postdated checks. However, I must point out that some states specifically prevent prosecution for postdated checks. *State v. Downing*, 488 P2d 112 (NMCA 1971); *State v. Beard*, 416 P2d 783, (Kan. SC 1966). The overriding consideration in determining if the law has been violated is whether there was a present intent to defraud. *Berry v. State*, 153 Ga. 169 (111 SE 669) (1922); *Brooks v. State*, 146 Ga. App. 626 (247 SE2d 209) (1978); *Crain v. State*, 78 Ga. App. 806 (52 SE2d 577) (1949); *Barnes v. Gossett Oil Co.*, 56 Ga. App. 220 (192 SE 254) (1937).

Rather than import foreign law, we can rely on present Georgia law to punish criminally fraudulent check transactions. The Georgia cases cited by the majority make it clear that the effect of postdating a check is to destroy the implied promise that there is currently

money on deposit to cover a check tendered for a present consideration. Where there is nothing but the implied promise on which to rely to show fraudulent intent, a postdated check will prevent conviction. "[A]t best, there is implied in the issuance of the checks a promise to cover the drafts when they were presented in the future. Such a promise of future performance cannot serve as a basis for a bad check charge. [Cit.] . . . [I]f a check is postdated, or if the giver of the check states that he has not enough money in the bank to cover it though he expects to have it by the time the check is presented for payment, there can be no implied representation that there is now enough on deposit to cover the check." *Bivens v. State*, 153 Ga. App. 631, 632 (266 SE2d 304) (1980). In the present case, however, as the majority correctly points out, there was more than that implication: there was evidence that appellant expressly represented that there were sufficient funds to cover the $4,000 check at the time of its tender, and there was evidence that appellant's account did not have $4,000 in it at the time the check was tendered. Thus, there was sufficient evidence to show that appellant had a fraudulent intent when he tendered the check.

Finally, the majority's heavy emphasis on the requirement that the payor of the check specifically make known to the payee that the check is postdated is an extension of Georgia law and one which inappropriately relieves the payee of its responsibility to exercise reasonable caution in commercial transactions. Under present Georgia law, the burden is placed on the receiver of a check to examine it, especially the date, to determine if it meets the requirement of the law. To do otherwise would be to open the floodgates for testimony to contradict the written instrument. While the majority approach has appeal in this case, it unfortunately provides us a blurred vision for the future. Each of the cases decided under the bad check law displays a commendable concern for drawing a line between criminality and civil wrongs. This common sense approach gives the law a sense of definition and direction.

For the reasons stated, I concur in the affirmance of appellant's conviction, but not with the majority's efforts to change the law in this area.

DECIDED NOVEMBER 6, 1989.

*Charles J. Vrono*, for appellant.
*Robert E. Wilson, District Attorney, Michael D. Thorpe, Robert M. Coker, Assistant District Attorneys*, for appellee.