**Sandra BLACKFORD, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

**Civil Action No. 492–142.**

United States District Court,
S.D. Georgia,
Savannah Division.

Jan. 11, 1996.

Wallace M. Brogdon, Jr., Franklin, Taulbee, Rushing, Bunce & Brogdon, Statesboro, GA, for plaintiff.

John A. Foster, Forbes and Bowman, Savannah, GA, Morton G. Forbes, Savannah, GA, for defendant.

### ORDER

EDENFIELD, Chief Judge.

Following remand of this malicious-prosecution case from the Eleventh Circuit, *Blackford v. Wal–Mart Stores, Inc.*, 47 F.3d 1119 (11th Cir.1995), defendant Wal–Mart Stores, Inc. ("Wal–Mart") has renewed its summary judgment motion. Plaintiff Sandra Blackford opposes the motion, arguing that an issue of fact remains.

### I. *BACKGROUND*

The general background facts are contained in the record, *Blackford v. Wal–Mart Stores, Inc.*, 17 F.3d 367, 367–68 (11th Cir. 1994) (*"Blackford I"*), *on certified question*, *Wal–Mart Stores, Inc. v. Blackford*, 264 Ga. 612, 612–13, 449 S.E.2d 293 (1994) (*"Blackford II"*), and therefore shall be repeated only in skeletal detail here. Blackford purchased Wal–Mart merchandise with a personal check that bounced, in response to which Wal–Mart had her arrested for violating Georgia's bad check statute, O.C.G.A. § 16–9–20(a).[1] Subsequent to her arrest, the

---

1. After the incident at issue in this case, O.C.G.A. § 16–9–20 was amended, effective July 1, 1994. *Blackford II*, 264 Ga. at 613 n. 2, 449 S.E.2d 293. The Court will therefore apply to this case the pre–1994 version as it appears in the main volume of O.C.G.A. § 16–9–20 (Michie 1992).

Some of the cases cited in this Order obviously construe even earlier versions of the same statute, though the relevant difference is, at least in this case, legally immaterial. *See e.g. Brooks v. State*, 146 Ga.App. 626, 626–27, 247 S.E.2d 209 (1978) ("miniscule difference").

charge was dismissed upon Wal–Mart's motion.

Blackford then sued Wal–Mart for malicious prosecution. O.C.G.A. § 51–7–40. During the ensuing trial this Court prevented Wal–Mart from presenting evidence that Blackford was in fact guilty of violating O.C.G.A. § 16–9–20(a). Trial Transcript ("T") at 407–08. Since the charges against Blackford had been dismissed, this Court reasoned that the sole issue was whether the circumstances created in Wal–Mart's mind a reasonable belief that there was probable cause for the arrest.

As noted in "*Blackford I*," however, Georgia law on this question was unsettled at the time. 17 F.3d at 368. The *Blackford II* court provided the necessary resolution and held that actual guilt evidence is admissible. 264 Ga. at 614, 449 S.E.2d 293. That led the Eleventh Circuit to reverse this Court's judgment. 47 F.3d at 1120. On remand, Wal–Mart seeks summary judgment based on evidence of Blackford's actual guilt. Given *Blackford II*'s clarification of malicious prosecution law, a preliminary review of the governing standards is therefore warranted here.

## II. *ANALYSIS*

### A. Malicious Prosecution Standards

■ The essential elements of a malicious prosecution claim include "(1) a prosecution instituted maliciously and (2) without probable cause which (3) has terminated favorably to the plaintiff." *Marriott Corp. v. Allen,* 218 Ga.App. 877, 463 S.E.2d 716 (1995) (citing *Blackford II* ); *accord, Rowe v. CSX Transportation, Inc.,* 219 Ga.App. 380, 465 S.E.2d 476 (1995); *see also Barber v. H & H Muller Enterprises, Inc.,* 197 Ga.App. 126, 129–30, 397 S.E.2d 563 (1990) (elaborating on the showing required for each element). A plaintiff's failure to prove any one of these essential elements therefore is fatal to her claim.

■ Thus, a defendant can obtain summary judgment on *liability* in a malicious prosecution case by showing that it had probable cause in obtaining the plaintiff's arrest. *Arbee v. Collins,* 219 Ga.App. 63, 64, 463

S.E.2d 922 (1995); *Allen,* 218 Ga.App. at 877, 463 S.E.2d 716. Similarly, the defendant can prevail by showing that it lacked malice when it instituted the prosecution. *Allen,* 218 Ga.App. at 878, 463 S.E.2d 716; *accord, Northern Telecom Inc. v. Wilkerson,* —— Ga.App. ——, 466 S.E.2d 221 (1995). Or, the defendant can show that the prosecution did not terminate in the plaintiff's favor. *Allen,* 218 Ga.App. at 877, 463 S.E.2d 716.

In *Allen,* for example, the plaintiff cashed a series of "insufficient funds" checks at a hotel, which had him arrested after he tried to cash two additional checks, one of which had bounced while the other was rejected by the hotel. *Id.,* 218 Ga.App. at 877, 463 S.E.2d 716. Four days after Allen's arrest, there was enough money in his account to cover the bounced check. Six days later, the State nolle prossed the bad check charge. *Id.*

Allen sued for, *inter alia,* malicious prosecution. The Georgia Court of Appeals held that, even though the hotel's bad check prosecution terminated favorably to plaintiff, nevertheless the hotel was entitled to summary judgment because there was no evidence that it instituted the prosecution without probable cause or with malice. 218 Ga.App. at 877–78, 463 S.E.2d 716; *accord Hartsfield v. Union City Chrysler–Plymouth,* 218 Ga.App. 873, 463 S.E.2d 713 (1995) (citing *Blackford II* ).

■ Those cases address liability. But a defendant can also defeat a malicious prosecution claim by showing that the plaintiff suffered no *damages,* thus exploiting the principle that a tort claim must fail where liability is established but no damages can be shown. *Blackford II,* 264 Ga. at 614, 449 S.E.2d 293; *see also Crowley v. Trust Co. Bank of Middle Georgia,* 219 Ga.App. 531, 466 S.E.2d 24 (1995); *cf., Worldwide Primates, Inc. v. McGreal,* 26 F.3d 1089 (11th Cir.1994) (imposing Rule 11 sanctions against plaintiff who resisted dismissal motion notwithstanding fact that it could show no damages even if liability existed).

■ In other words, "while an innocent person prosecuted with malice and without

probable cause has suffered damages for which the tort provides redress, conversely, a person who has been arrested for a crime which he committed has suffered no harm." *Blackford II,* 264 Ga. at 614, 449 S.E.2d 293. Indeed,

> it is said that a malicious prosecution action is for the injury suffered by an innocent, hence the guilty have no cause of action; that actual guilt establishes as a matter of law that the defendant acted with probable cause in causing the prosecution of the plaintiff; and that a criminal fortunate enough to escape conviction should rest content with his good luck and not belabor one who suspected his guilt and acted accordingly.

52 Am.Jur.2d *Malicious Prosecution* § 76 (1970) (footnotes omitted); *see also James v. Fast Fare, Inc.,* 685 F.Supp. 565, 567–68 (D.S.C.1988) (applying Restatement (Second) of Torts § 657 to bar malicious prosecution claim where plaintiff admitted she knew there were insufficient funds when she wrote her checks; merchant was entitled to press for her arrest even if her husband was prevented from making restitution prior to her arrest).

Thus, by showing that the plaintiff actually is guilty of passing a bad check, a defendant can prevail in this context.

## B. Sandra Blackford's Malicious Prosecution Claim

 Wal–Mart contends that, because Blackford actually passed a bad check in violation of O.C.G.A. § 16–9–20(a), she can show no damages and thus has no case. "[T]he crime [of violating O.C.G.A. § 16–9–20(a)] occurs at the time the check is issued." *Allen,* 218 Ga.App. at 878, 463 S.E.2d 716. Under the pre–July 1994 version of the statute,

> [a] person commits the offense of criminal issuance of a bad check when he makes, draws, utters, or delivers a check, draft or

order for the payment of money on any bank or other depository in exchange for a present consideration or wages, *knowing* that it will not be honored by the drawee. * * *

O.C.G.A. § 16–9–20(a) (Michie 1992) (emphasis added). Wal–Mart therefore must prove that Blackford

(a) issued a check to Wal–Mart;

(b) in exchange for a present consideration;[2]

(c) knowing at the time she issued her check that it would not be honored by the drawee (*i.e.* the bank upon which plaintiff drew her check).

O.C.G.A. § 16–9–20(a) (Michie 1992); *Galbreath v. State,* 193 Ga.App. 410, 415, 387 S.E.2d 915 (1989); *Russell v. State,* 155 Ga. App. 555, 271 S.E.2d 689 (1980); *Brooks v. State,* 146 Ga.App. 626, 627–28, 247 S.E.2d 209 (1978).

 As to element (c), "[k]nowledge that because of insufficient funds the check will not be honored is prima-facie proof of intent to defraud." *Brooks,* 146 Ga.App. at 626, 247 S.E.2d 209; *accord, Hardeman v. State,* 154 Ga.App. 364, 364–65, 268 S.E.2d 415 (1980); *see also Pittman v. State,* 154 Ga.App. 691, 269 S.E.2d 522 (1980) (prima facie case established where check-writer had "no account with the drawee [bank] at the time the [check] was made, drawn, uttered or delivered"). Where, as in this case, a check-writer does not come out and admit she knew that "because of insufficient funds [her] check [would] not be honored," *Brooks,* 146 Ga.App. at 626, 247 S.E.2d 209, the issue then turns on what quantum of evidence is required to show constructive knowledge of same.

The appeals court in *Gilley v. State,* 182 Ga.App. 681, 356 S.E.2d 655 (1987), upheld Gilley's bad-check conviction because he paid contractors for work they performed with two checks dated February 18 and 20, 1985. *Id.* at 681–82, 356 S.E.2d 655. "The checks

---

**2.** The parties do not dispute that plaintiff received property of value (merchandise), that is, present consideration, at the time she issued her check to Wal–Mart. *See Griffith v. State,* 249 Ga. 19, 20–21, 287 S.E.2d 187 (1982) (because a § 16–9–20 violation requires "present consider-

ation," it must be shown that the violator issued the worthless check "in exchange for something of value" in "a contemporaneous transaction because the payee must give up something of value in reliance on the check in question").

were subsequently returned to [the contractors] unpaid because [Gilley's] checking account had been closed by the bank on February 20. For each day from January 31, 1985 until the account was closed, [Gilley] had maintained a negative daily balance in the checking account." *Id.* at 682, 356 S.E.2d 655. This was sufficient evidence to support the knowledge element of Gilley's bad-check offense, *id.*, and thus, by definition, constituted evidence beyond a reasonable doubt to support the *mens rea* component of Gilley's conviction.

In this *civil* case, in which Wal–Mart need only prove actual guilt by a preponderance of the evidence, the parties do not dispute that, while there was a positive balance to Blackford's account when she wrote her check payable to Wal–Mart on May 4, 1991, there were no funds to meet it on May 8, 1991, when the check reached her bank. The dispositive issue therefore turns on whether, on May 4, 1991, Blackford "*kn[ew]* that [her Wal–Mart check would] not be honored by the drawee." O.C.G.A. § 16–9–20(a) (emphasis added).

Pointing to record evidence,[3] Wal–Mart insists that Blackford knew or should have known, at the time she gave Wal–Mart her check, that there were insufficient funds to enable her bank to honor it. When questioned about this matter plaintiff initially claimed that, when she wrote the May 4th check to Wal–Mart she believed there were sufficient funds in her checking account to cover it. 9/28/92 Blackford Dep. at 61, 92. However, she also admitted that she had been having "problems" balancing her checkbook during this period, and she could not recall, in conjunction with the "Wal–Mart" check, the last time she had balanced her checkbook. *Id.* at 63, 65; 12/1/92 Blackford Dep. at 34, 40–41; *see also* T. at 410, 412

("Now, you're not sure when you stopped balancing—excuse me—you're not sure when you first became aware you were having a problem balancing your checkbook, is that right? A. That's right, sir"). Blackford also admitted that she "could not recall" the last time she had opened the monthly checking account statements which she received from her bank. 12/1/92 Blackford Dep. at 41.

By the time of trial plaintiff further admitted that, had she been balancing her checkbook in April, 1991, she would have been able to determine whether she had a negative balance following the April statement. T. at 414–15. This followed her admission, made in her second deposition, that during April and May, 1991, she simply did not maintain her checkbook. 12/1/92 Blackford Dep. at 33–34. Further, she at that time did not bother to open the dishonored-check notices that she had been receiving from her bank. T. 412.[4] She does not dispute that her bank routinely sent overdraft notices to its customers the day after each check bounced, and that each notice reflects the bank's overdraft fee. Spillman Dep. at 32–33, 36, 55–57.

In a trial exhibit previously tendered into the record, Wal–Mart retroactively balanced Blackford's checkbook for the relevant time period. Trial Exh. D–32; T. 409. It shows that, had Blackford properly maintained her checkbook balance and accounted for then-accrued bounced check fees, she would have realized that, from April 29 to May 1, 1991, she ran a negative balance. Moreover, her May 2, 1991, $1,041.52 deposit was immediately wiped out by pre–May 2nd issued checks, reducing her account to a negative $22.08 balance by May 7, 1991, the day before the "Wal–Mart check" was presented to her bank and promptly bounced. Trial (D)

---

**3.** In *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir.1993), the Eleventh Circuit exhaustively explained the shifting burdens of proof with respect to F.R.Civ.P. 56 motions post-*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). 2 F.3d at 1116–17. Those principles shall be applied here. To that end, although this "is a diversity action and Georgia state law provides the controlling substantive law, federal law governs the sufficiency of the evidence necessary to preclude a grant of

summary judgment." *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir.1993).

**4.** Q. All right. Now, after you stopped balancing your checkbook when the bank was sending you the notices that your checks were being dishonored, you didn't open them? You just put them aside in the unpaid bill file, is that right?
A. That's what I told you, yes, sir.
T. at 412.

Exh. 32 at 2; Trial (D) Exh. 20 at 2–3; Spillman Dep. at 86–87, 89, 109.

This activity, incidentally, fits into a larger picture created by a much longer checking account history. Blackford's bank statements and Wal–Mart's checkbook balance reconstruction (Trial Exh D–32), the accuracy of which she does not dispute, show that, beginning with her "5/29/90 Statement," she had a persistent history of check-bouncing and negative balances long prior to the May 4, 1991 "Wal–Mart check." *See* Spillman Dep. Exh. 1 (two "returned checks" during 4/30/90—5/29/90 period); Trial (D) Exh. 9 (five "returned checks" during 5/30/90—6/26/90 period); Spillman Dep. at 43 & Trial (D) Exh. 12 (two "returned checks" and three overdraft fees during 9/11/90—9/25/90 period); Spillman Dep. at 45–46 & Trial (D) Exh. 13 (six "returned checks" and $90 in overdraft fees during 9/28/90—10/22/90 period); Spillman Dep. at 59–60 & Trial (D) Exh. 14 (four "returned checks" during 11/14/90—11/20/90 period); Trial (D) Exh. 15 (one "returned check" on 12/3/90); Spillman Dep. at 65 & Trial (D) Exh. 16 (12/26/90 negative balance and 12/27/90 overdraft fee);[5] Spillman Dep. at 67 & Trial (D) Exh. 17 (2/1/91 negative balance, 2/1/91 overdraft & 2/4/91 overdraft fee); Spillman Dep. at 67–69 & Trial (D) Exh. 18 (2/28/91 & 3/1/91 negative balances; $15 overdraft fee on 3/1/91 for one overdrawn check; $60 overdraft fee on 3/4/91 for four overdrawn checks which bank nevertheless honored); Spillman Dep. at 76 & Trial (D) Exh. 19 (four "returned checks" on 3/27/91 and $60 in overdraft fees); Spillman Dep. at 76–78 (4/23/91 "returned check" and $15 overdraft fee); Spillman Dep. at 86–87 & Trial (D) Exh. 20 (eight "returned checks"

during 4/30/91—5/2/91 period); 12/1/92 Blackford Dep. at 36–41.

Between April 23, 1991 and May 3, 1991 alone, plaintiff incurred $120 in bad-check charges and, had she balanced her checkbook, she or any reasonable person in her situation would have realized that she was running a negative balance from the April 29—May 4, 1991 time period. Trial (D) Exh. 32. Further, when she did deposit money she likewise should have realized, again had she bothered to balance her check book, that the resulting positive balance was fleeting at best. *See* Trial (D) Exh. 32. For example, she deposited $3,755 into her account on April 26, 1991. However, had she been balancing her checkbook, she would have recorded and thus noted that a $3,200 check that she wrote on April 28, 1991 and was exchanged for a cashier's check the next day (*see* Spillman Dep. at 100–05 & Exh. 25; Trial (D) Exh. 30), together with several smaller checks, immediately negatived her balance by $219.31 just three days later (April 29, 1991). Trial (D) Exh. 32 at 1.

To reiterate, this framed the "big picture" for plaintiff when she ran a negative balance from April 29 to May 1, 1991, brought it positive by a May 2, 1991, $1,041.52 deposit, but immediately drained it out by previously written checks, knocking her back down to a negative $22.08 balance by May 7, 1991, the day before the "Wal–Mart check" was presented to her bank and promptly bounced. Trial (D) Exh. 32 at 2; Trial (D) Exh. 20 at 2–3; Spillman Dep. at 86–87, 89, 109.[6] These records likewise fill in plaintiff's after-the-fact memory gaps, and, since the bank's statements and contemporaneously generated bounced check notices placed her on no-

---

5. Overdraft fees were charged not just for bounced checks, but also for negative balances caused by cash withdrawals from automatic teller machines. Spillman Dep. at 27. In addition, unnumbered checks appearing on plaintiff's statements were either "starter" checks, "counter" checks, or numbered checks unread by the bank's automated check-reading machinery. *Id.* at 60.

6. For that matter, plaintiff's check-bouncing continued beyond the May 4, 1991 Wal–Mart check. *See* Trial (D) Exhs. 20–22 (sixteen "returned checks" during 5/8/91—6/26/91 period); Spillman Dep. at 95–97, 112–13. Her severe finan-

cial problems persisted so long that, "probably in the summertime [of 1991]," even she "realized that it was time for me to put the pen and the checkbook down.... [b]ecause I had overdrawn checks and I could not balance my checkbook." 9/28/92 Blackford Dep. at 64. Her realization coincided, incidentally, with her bank's decision to close her account without her consent on June 25, 1991, due to her failure to remedy the overdraft status of the account. Spillman Dep. at 9–10; *see also id.* at 10, 114 (she failed to pay the difference; the bank wrote off her negative balance and absorbed the loss).

tice, she cannot avoid imputation of "knowledge" by not bothering to read them at the time, nor create an issue of fact by now claiming she "cannot remember" precisely when she failed to reconcile her bank's statements with own checkbook balance.

To that end, it is ultimately meaningless to point to large periodic deposits, for the record shows that those deposits were immediately drawn down by immediately previous or subsequently written checks which plaintiff, by issuing those checks, obviously had to know about. Trial (D) Exh. 20, 32. In any event, it is the fact of chronic check-bouncing accompanied by constantly recurring negative balances (and thus notice that no funds would be available when subsequent checks are written), and not the actual amount of any particular deposit and offsetting check, that figures into the legal analysis whether § 16–9–20(a) "knowledge" may be imputed to plaintiff. The *Gilley* court, it must be remembered, paid no heed to the *amount* of Gilley's negative checking account balance on any given day, nor the amount of the checks written on it, but instead focussed on the fact that he ran a negative balance and persistent check bouncing prior to issuing the two checks upon which he was convicted.

The instant record shows that a reasonable person, exercising reasonable prudence, would have known that writing a check to anyone on May 4, 1991 would be a high-risk activity at best. Plaintiff's own testimony and bank records reveal a persistent, "ostrich" method of checkbook balancing that easily rises to that level of recklessness which equates to knowledge of fraudulent intent sufficient to sustain a conviction. Thus, although Blackford's negative check balance was not *consistently* negative, as was the case in *Gilley*, 182 Ga.App. at 682, 356 S.E.2d 655, nevertheless Wal–Mart's evidence is sufficient in light of the totality of circumstances, namely, the fact that Black-

ford (a) maintained a persistent (albeit not completely uniform) prior history of bouncing checks and overdrawing her account; (b) wilfully disregarded bank "bounce" notices; and (c) neglected to balance her own checkbook for April and May, 1991, if not prior to that period.

■ Stated differently, that evidence equates the knowledge element of her case to the *Gilley* case, for no rational jury could find anything but the fact that Blackford maintained a reckless, "Russian Roulette" approach to check-writing, with seemingly every tenth or so check set to bounce when written (thirty-eight bounced in the twelve months prior to the "Wal–Mart check"). At least in civil cases, it can be safely concluded that this level of recklessness meets the knowledge[7] component of the above-stated "element (c)" to the showing Wal–Mart must make under Georgia's bad check statute: knowing at the time she issued her check that it would not be honored by the drawee (*i.e.* the bank upon which plaintiff drew her check).

While many may be prone to an occasional arithmetic mistake and thus should face no threat of criminal proceedings on that ground, that is a far cry from what happened in this case. Plaintiff's conduct in chronically overdrawing her account and bouncing checks placed her on notice that writing a check on May 4, 1991 entailed a reckless risk; by that day she knew or should have known that writing a check to anyone was a crap-shoot at best. She finally (albeit belatedly) recognized that fact shortly thereafter when she stopped using checks altogether, 9/28/92 Blackford Dep. at 64 (though she had no choice, for the bank closed her account on June 25, 1991, Spillman Dep. at 9–10, 114).

What plaintiff overlooked here is that with benefits come burdens. Those who indulge

---

7. It is an elementary tenet of civil and criminal law that wilful ignorance, or reckless indifference to the facts, is the functional equivalent of knowledge. *See e.g., U.S. v. Sirang,* 70 F.3d 588, 592, 594 (11th Cir.1995) (upholding, in bad-check based bank fraud case, jury charge that "[s]tatements or representations are false or fraudulent if they relate to a material fact, if they are known to be untrue or if they are made *with*

*reckless indifference* as to the truth or falsity of the statement") (emphasis added). *See also Ball v. State,* 149 Ga.App. 270, 272, 253 S.E.2d 886 (1979) ("the word 'knowingly' shall be deemed to be either actual or constructive knowledge … and that a person has constructive knowledge of facts which would put a reasonable and prudent person on notice….").

in the privilege of paying with checks must bear the responsibility of sitting down every month to balance their checking account balance. To childishly ignore one's checkbook balance, bank statements, "bounce" notices (etc.) and recklessly write checks with no concern for whether money sits behind them both unduly burdens commerce and shifts the cost of such sloppiness onto the public through the form of higher retail prices needed to absorb the cost of bounced checks. "No-fault" deficit check writing simply does not exist.

Plaintiff's claim that she cannot remember how much attention she had been paying to her bank's statements and the status of her checking account on or about May 4, 1991, does not create an issue of fact. She admitted that she was able but neglected to balance her checkbook during April and May, 1991, and in any event her own pre-May 4th monthly checking-account statements (again, Gilley's bank statements alone were sufficient to sustain his bad-check conviction in *Gilley*), placed her on notice that, as of May 4, 1991, she was at the "Russian Roulette" stage of check writing. She obviously ignored her bank's notices and neglected her checkbook at her peril.

## III. *CONCLUSION*

Wal–Mart therefore is entitled to summary judgment. This "ruling comports with the policy of [Georgia] courts that malicious prosecution suits are disfavored and citizens are encouraged to bring to justice those who are apparently guilty." *Blackford II,* 264 Ga. at 614, 449 S.E.2d 293; *accord, Rowe,* 219 Ga. App. at ——, 465 S.E.2d 476.

SO ORDERED.